UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA, CASE NO: 8:07-CR-119-T-26MAP

Plaintiff,

VS.                                    Tampa, Florida
                                       June 26, 2008

JESUS ERNESTO MONDRAGON-GARCIA,    9:00 a.m.
and JOSE ALONSO NUNEZ-GUTIERREZ


Defendants.
_____/

EXCERPTS OF TRANSCRIPT OF SENTENCING PROCEEDINGS
BEFORE THE HONORABLE RICHARD A. LAZZARA
UNITED STATES DISTRICT JUDGE


APPEARANCES:


Counsel for Plaintiff:   CHRISTOPHER MURRAY, ESQUIRE
                         U. S. Attorney's Office
                         400 N. Tampa Street
                         Suite 3200
                         Tampa, Florida  33602
                         813-274-6000
                         chris.murray@usdoj.gov


Counsel for Defendant    MS. LINDA GEORGE
Mondragon-Garcia:        505 Main Street
                         Suite 214
                         Hackensack, New Jersey 07601
                         201-487-5225
                         lgdefense@yahoo.com


Counsel for Defendant    JOSE R. E. BATISTA, ESQUIRE
Nunez-Gutierrez:         Batista & Batista, P.A.
                         7171 Coral Way
                         Suite 400
                         Miami, Florida  33155
                         303-267-5139
                         jreblaw@bellsouth.net

CLAUDIA SPANGLER-FRY, OFFICIAL U. S. COURT REPORTER

Court Reporter:          CLAUDIA SPANGLER-FRY, RPR, CM
                         Official Court Reporter
                         801 North Florida Avenue
                         15th Floor
                         Tampa, Florida  33602
                         813-301-5575
                         cookiefry@aol.com

P R O C E E D I N G S

June 26, 2008

* * * * *

THE COURT:  All right, Madam Clerk, would you please swear the Interpreter.

(Thereupon, the Interpreter was sworn.)

THE INTERPRETER:  I do.  Yes, good morning, Your Honor, my name is Pedro Marino, my last name is spelled M-A-R-I-N-O.

THE COURT:  Madam Clerk, would you please call the case.

THE CLERK:  United States of America versus Jesus Ernesto Mondragon-Garcia and Jose Alonso Nunez-Gutierrez, case number 8:07-Criminal-119-T-26MAP.

Counsel, please state your name for the record.

MR. MURRAY:  Good morning, Your Honor, Christopher Murray for the United States, filling in for Joseph Ruddy, and to my left is Special Agent Jeb Ferebee.

THE COURT:  All right.

MS. GEORGE:  Good morning, Your Honor, Linda George on behalf of Jesus Ernesto Mondragon-Garcia.

MR. BATISTA:  Good morning, Your Honor, Jose Batista on behalf of Jose Alonso Nunez-Gutierrez.

THE COURT:  Mr. Mondragon-Garcia, please stand

and be sworn by the Clerk.

Thereupon,

JESUS ERNESTO MONDRAGON-GARCIA,

having first been duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE DEFENDANT:  I do.

THE COURT:  Have a seat, please.  Sir, you are Jose Alonso Nunez-Gutierrez -- excuse me -- you are Jesus Ernesto Mondragon-Garcia?

DEFENDANT MONDRAGON-GARCIA:  Yes.

THE COURT:  As you know, we are here today for your sentencing, and during the course of this proceeding you may be asked some questions.  If you're asked any questions, and you choose to answer, do I have your assurance that you will answer all questions truthfully and completely?

DEFENDANT MONDRAGON-GARCIA:  Yes, Your Honor.

THE COURT:  As you also know, on March 10th of this year, you appeared before me and you pled guilty to Counts 1 and 2 of the Indictment in this case.

Count 1 charged you with conspiracy to manufacture and to distribute five kilograms or more of cocaine for importation into the United States in violation of Federal Law.

Count 2 charged you with conspiracy to possess with the intent to distribute five kilograms or more of cocaine while aboard a vessel subject to the jurisdiction of the United States in violation of Federal Law.

I previously accepted your guilty pleas and I adjudged you to be guilty of those offenses, and we are now at the stage of the proceedings where it's my obligation to address questions to you, to your attorney and to the Assistant United States Attorney.

Ms. George, prior to this proceeding, did you have an opportunity to meet with your client and to review and to discuss with him, in detail, the contents of his Pre-Sentence Report?

MS. GEORGE:  I did, Your Honor.

THE COURT:  Did you do that with the assistance of a Spanish Interpreter?

MS. GEORGE:  No, I was able to communicate with him in Spanish myself and it was provided to him in writing in Spanish.

THE COURT:  All right.  So you are fluent in the Spanish language?

MS. GEORGE:  Well, enough to get by with him and he speaks English as well, my client does, a little bit of English.

THE COURT:  All right.

MS. GEORGE:  I wouldn't want to lecture at the Hague in Spanish, but I can make my way.

THE COURT:  All right.  Now, Mr. Mondragon-Garcia, prior to this proceeding, did you, in fact, have an opportunity to meet with Ms. George and to review and to discuss with her, in detail, the contents of your Pre-Sentence Report?

DEFENDANT MONDRAGON-GARCIA:  Yes, Your Honor.

THE COURT:  Did you have any problems whatsoever communicating with her?

DEFENDANT MONDRAGON-GARCIA:  No.

THE COURT:  All right.  I note that there are certain objections and we'll get to them in a moment.

Mr. Jose Alonso Nunez-Gutierrez, would you please be stand and be sworn by the Clerk.

Thereupon,

JOSE ALONSO NUNEZ-GUTIERREZ,

having first been duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

DEFENDANT NUNEZ-GUTIERREZ:  I do.

THE COURT:  Have a seat, please, sir.

You are Jose Alonso Nunez-Gutierrez?

DEFENDANT NUNEZ-GUTIERREZ:  Yes.

THE COURT:  As you know, sir, on March 10th of

2008, you also appeared before me and you pled guilty to Counts 1 and 2 of the Indictment in this case.

Count 1 charged you with conspiracy to manufacture and to distribute five kilograms or more of cocaine for importation into the United States in violation of Federal Law.

Count 2 charged you with conspiracy to possess with the intent to distribute five kilograms or more of cocaine while aboard a vessel subject to the jurisdiction of the United States in violation of Federal Law.  I also accepted your guilty pleas and I adjudged you to be guilty of those offenses.

And we are now at the stage of the proceedings where it's my obligation to address questions to you, to your attorney and to the Assistant United States Attorney.

Mr. Batista, prior to this proceeding, did you have an opportunity to receive and thereafter to review and to discuss, in detail, with your client the contents of his Pre-Sentence Report?

MR. BATISTA:  Yes, sir.

THE COURT:  Did you do that with the assistance of an Interpreter?

MR. BATISTA:  No, sir, I'm fluent in Spanish and I translated to him in Spanish.

THE COURT:  All right.  Did you have any problems communicating with him?

MR. BATISTA:  No, sir.

THE COURT:  Okay.  And Mr. Nunez-Gutierrez, prior to today, did you have an opportunity to meet with your attorney, Mr. Batista, and to review and to discuss with him, in detail, the contents of your Pre-Sentence Report?

DEFENDANT NUNEZ-GUTIERREZ:  Yes.

THE COURT:  Did you have any problems communicating with him in the Spanish language?

DEFENDANT NUNEZ-GUTIERREZ:  No.

THE COURT:  All right.  All right, it looks like I may have to take some testimony here.

MR. MURRAY:  Yes, Your Honor.

THE COURT:  Because I note -- well, with regard to Mr. Mondragon-Garcia, he objects to the factual statement in paragraph eight and paragraph 16.  He also objects to receiving an enhancement for organizer and leader.  That also impacts the safety valve.  And he objects to not receiving the third level for acceptance of responsibility.

With regard to Mr. Nunez-Gutierrez, he objects, likewise, to paragraphs eight and 16, the factual statements.  He also objects to receiving the enhancement

for organizer and leader which impacts the safety valve consideration.  He also objects to not receiving the one level -- the extra one level for acceptance of responsibility and he makes a general objection under the Sixth Amendment that I cannot enhance his sentence based upon facts not charged in the Indictment and proved by a jury beyond a reasonable doubt.

Yes?

MS. GEORGE:  Your Honor, may we approach before we proceed?

THE COURT:  Are you telling me you want me to continue this sentencing?

MS. GEORGE:  No.

THE COURT:  Okay.  So why do you have to approach?

MS. GEORGE:  On an issue that -- regarding possibly sealing the record.  I wanted to explain why.

THE COURT:  Well, the only people in this Courtroom are Court personnel.  Are you asking me to seal this part of the record?

MS. GEORGE:  No.  As we go forward, I would just like to explain possibly it may not have to be on the record what we need to explain.

THE COURT:  Everything is on the record.  I will consider this in camera.  Go ahead.

(Thereupon, in camera colloquy was had and not included in this transcript.)

MS. GEORGE:  All right.  Thank you, Your Honor.

THE COURT:  All right.  Mr. Murray, you got a witness?

MR. MURRAY:  Yes, Your Honor, the United States calls Special Agent Jeb Ferebee of DEA.

THE COURT:  All right, sir, if you would come forward and be sworn by the Clerk.

Thereupon,

JEB FEREBEE,

having first been duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Please take a seat in the witness box.

Please state your name and spell your last for the record.

THE WITNESS:  My first name is Jeb, J-E-B, last name is Ferebee, F-E-R-E-B-E-E.

MR. MURRAY:  May I proceed, Your Honor?

THE COURT:  Yes, sir.

DIRECT EXAMINATION

BY MR. MURRAY:

Q.    How are you employed?

A.    Special agent with the Drug Enforcement Administration here in Tampa, Florida.

Q.    As part of your duties, did you investigate the circumstances leading up to the interdiction of the Motor Vessel Gatun in the Eastern Pacific Ocean on March 18th, 2007?

A.    Yes, sir.

Q.    As part of that investigation, did you interview the crew members on board that vessel?

A.    Yes, I did.

Q.    Could you describe for the Court the results of the interview of the chief engineer of that vessel?  Could you summarize that interview?

A.    Yes, sir.  The chief engineer was an individual by the name of Jesus Yejuin-Rodriguez.  In the course of interviewing him on several occasions, he indicated that his involvement on the Merchant Vessel Gatun began by being hired by Mr. Mondragon.  In the course of -- after being hired by Mr. Mondragon, he came to meet what was referred to as his partner and that was Mr. Nunez-Gutierrez.

Q.    Do you see both of those gentlemen here in Court today?

A.    Yes, sir, they're right here at the defense table.

Q.   Could you point them out and state something they're wearing for the record?

A.   Mr. Nunez-Gutierrez is the gentleman in the blue shirt here, Mr. Mondragon-Garcia is in the gray with the red stripe.

MR. MURRAY:  Your Honor, let the record reflect the witness has identified the Defendants Mondragon and Nunez-Gutierrez.

THE COURT:  All right, the record will reflect that fact.

BY  MR. MURRAY:

Q.   What did the chief engineer say Mr. Mondragon's role was in this conspiracy?

A.   The two gentlemen, Mr. Mondragon and Mr. Nunez, were referred to by many on the vessel as los licensiados, and that is, I'm not Spanish, but it was explained to me that that was basically a term as the professionals or -- but as told to me by the crew members, to them it meant that they were the ones in charge, they were the bosses, that was the common discussion amongst the crew members on the vessel.

Q.   Did the chief engineer indicate which one of these, if any, paid him?

A.   There was an indication that there was a prior load in November of '06 on the -- in which the Merchant Vessel

Gatun was utilized.  For that load which was successful, Mr. Yajuin-Rodriguez indicated that the money that was due for his participation in that first successful load was delivered to his spouse by Mr. Nunez-Gutierrez.

MS. GEORGE: Your Honor, I have an objection.

THE COURT:  What?

MS. GEORGE:  To the extent that the agent is referring to his notes, if these are reports that we've already received, then I have no problem.  If these are new reports that we haven't received, I'd like to have a copy of it, whatever he's referring to.

MR. MURRAY:  Your Honor, I'm not sure if those have been turned over or not, but I'd be happy to disclose them after special agent --

THE COURT:  Do you know whether they have been disclosed by Mr. Ruddy prior?

THE WITNESS:  Your Honor, my understanding, all the reports as part of the discovery process were turned over.  Now there are some notes that I'm referring to based on trial prep interviews with some of these Defendants that have not been memorialized in reports, that is, just rough notes that I have glanced at prior to coming in here this morning.

THE COURT: Okay.

MS. GEORGE:  It's my understanding the

Government will provide me a copy of that then?

THE COURT:  Sure.  I mean, those rough notes, can anyone besides you read them?

THE WITNESS:  Well, I'm not sure I can answer that, Your Honor.

THE COURT:  Okay.

MS. GEORGE:  I'll try.  Thank you.

THE COURT:  All right.

BY MR. MURRAY:

Q.    Beyond the chief engineer, Special Agent Ferebee, who else did you interview in this conspiracy?

A.    The first officer, an individual by the name of Jorge Casares-Lizanaga.  He indicated that he was hired by Mr. Mondragon, and shortly after that, he was introduced to Mr. Nunez-Gutierrez as Mr. Mondragon's partner.  He indicated that he socialized with them on several occasions in Panama and he indicated he had actually been paid for that successful November load by Mr. Mondragon.

Q.    Beyond that person, did you interview anyone else?

A.    Yes, Captain Francisco Valdez.  Captain Valdez indicated that he was hired by Mr. Nunez-Gutierrez, that his name had been referred to Nunez-Gutierrez by Mr. Yajuin -- actually, Mr. Yajuin-Rodriguez, the chief engineer, had referred his name to Mr. Nunez and then

that led to Mr. Nunez being hired -- or excuse me -- that led to Mr. Valdez being hired by Mr. Nunez.

He ended up traveling to Panama which is where he had his first face-to-face meeting with Mr. Nunez and it was explained about the upcoming November smuggling operation aboard the Gatun, and shortly after meeting Mr. Nunez, he then meets Mr. Mondragon.

Q.    Did any other crew members on the Gatun implicate Mr. Nunez and Mr. Mondragon?

A.    Yes, the boatswain, an individual by the name of Jose Saragosa-Goveo, and there's a relationship there between Mr. Saragosa-Goveo and Mr. Valdez.  Mr. Valdez, the captain, is actually married to Mr. Saragosa-Goveo's daughter.

Mr. Saragosa-Goveo actually indicated that he was hired to be on the Gatun by another individual, but upon arriving on the Gatun, he traveled from México to Panama where the Gatun was at that time, and upon arriving on the vessel, he meets Mr. Nunez who indicates to him that he's the one in charge.

Mr. Saragosa further indicated that after the successful operation -- excuse me -- after the successful November operation, that Mr. Nunez actually came to his residence carrying a suitcase full of cash which was to be used for distribution to the other crew members for

payment for participating in that November load.

Q.    And these four crew members you've testified about on the Gatun, those were all at somewhat of a senior level on the Gatun itself, right?

A.    Yes, sir, that's correct, yes, sir.

Q.    The Motor Vessel Gatun, that's a coastal freighter; is that right?

A.    Yes, I refer to it as a merchant vessel.  It's a 330-foot freighter.  I'm not a maritime expert, but I would -- coastal freighter would be apparently a fair description of it.

Q.    It ships containers?

A.    Yes, sir, containers and bulk freight such as sand and such.

Q.    In the interdiction on March 18th, 2007, that involved over 19 tons of cocaine on that vessel; is that right?

A.    Yes, sir, approximately 19 and a half tons is -- was the initial seizure reporting.

Q.    To your knowledge, is that the largest maritime cocaine seizure in history?

A.    They were reporting it at the time, I think, as being the largest, there may have been something that happened more recent that maybe might have exceeded that. I recall reading something in México in the last year,

possibly, but it was at least if not the largest one or first or second largest at the time.

Q.   Probably the largest by the United States then?

A.   That could possibly be, yes, sir.

Q.   Have you received any information that would contradict or would show that Nunez and Mondragon were not organizers and leaders for this venture?

A.   Not that would not contradict.  Obviously, in my job as an investigator, I'm looking to see if there's CEOs of corporations that may be at a higher level, and I do have some indications that there are others at a high level, higher than these two gentlemen, but in terms of operating the Gatun, or the 11 or so crew members organizing the routes for the various freight contracts and so forth, these two gentlemen were the ones that were responsible for that.

Q.   There's 13 crew members on the Gatun; is that right?

A.   Yes, sir, there was a contingent of Méxican nationals and then three Panamanians that were turned over to the Panamanian authorities at the time of the seizure.

Q.   Okay, so 14 total?

A.   Yes, sir, I think that would be accurate, I'd have to go back and check, but --

MR. MURRAY:  Pass the witness, Your Honor.

THE COURT:  Ms. George.

MS. GEORGE:  Thank you, Your Honor.

THE COURT:  You have those notes that you were talking about there?

THE WITNESS:  Your Honor, I have to look, I've got kind of a batch of paperwork.  I could see if I have them here.  Do you want to --

MS. GEORGE:  Your Honor, I could proceed and then maybe reserve to recall so we don't waste any time here.

THE COURT:  All right, go ahead.

CROSS-EXAMINATION

BY MS. GEORGE:

Q.    Agent Ferebee, apart from speaking to these four crewmen that you referred to today, what did you do independently to verify -- let's start with Mr. Yajuin, what Mr. Yajuin had to say?

A.    Independent -- could you be more specific?

Q.    Okay.  Did you -- if Mr. Yajuin told you that he was paid by either Mr. Nunez or Mr. Gutierrez, or Mr. Nunez or Mr. Mondragon, did he provide you any dates?

A.    Approximate dates.

Q.    Did you do anything to verify where he was on that date, as an example?

A.    Not in the sense that I did not -- I did not make any effort to call México and verify.  That's a very difficult -- I did not do that, no, ma'am.

Q.    Okay.  And you're aware that in this case there was a file of investigations that were conducted by the Panamanian Government, correct?

A.    I would assume that there was one.  I have not seen a file or, in the course of the Panamanian authorities doing it, that is reasonable to assume that they have some type of case file down there, yes, but I have not seen that.

Q.    Well, you're aware that when we were -- let me rephrase that.  When we prepared for trial, we advised both you and Mr. Ruddy that there was a file called a Tomo, T-O-M-O; you're aware of that, correct?

A.    A Tomo, ma'am, you may have said that to us or something along those lines, I don't recall that, that's not a term I'm familiar with.

Q.    And did you ever receive copies from me of anything that was in the Panamanian investigation, of anything?

A.    I don't recall, but it's likely that you probably did give me something.  If you have something that you could -- you likely did give me something, but I just don't remember what that would have been.

Q.    And you also have copies of business records from

Mr. Mondragon, correct?

A.    Yes.

Q.    And those were things that were seized out of a computer, correct?

A.    Yes.

Q.    And out of what you have reviewed from the computer, was there anything that verified what Mr. Yajuin said?

A.    Most specifically, I recall seeing a ledger sheet and I believe it was a ledger sheet which had the various crew members on it.  This was just one document.  And that particular document had indications of monetary figures that were paid to the various crew members in the $30,000 range, and I don't remember the exact figures, but $30,000 range, and there was an indication that that ledger sheet was a ledger sheet showing payments made to the crew members.  That specific document, I do recall seeing that.

Q.    And that ledger sheet showed money coming in, correct?

A.    No, this particular one -- this one document I'm referring to that I'm specifically remembering is a -- what it appeared to me was, it was a ledger sheet showing that this crew member was paid $30,000, and it was referencing the November load.  In other words, it was

kind of a ledger sheet indicating what each crew member got paid for participating in the --

Q.    But that ledger sheet showed that money came in, correct?

A.    I think it was a disbursement ledger, it was just showing, hey, he got 50, he got 70 -- I recall it as showing who got paid.  Now maybe the top of the sheet or if you have it we could look at it together, but I don't remember, maybe the top sheet might have said 150,000 and then 30 to this gentlemen, 30 to that, I don't recall, but my memory is I remember it was showing who was getting paid for the participation in that November load.

Q.    And do you know from Mr. Yajuin how Mr. Mondragon got the money?

A.    Would you restate the question again?

Q.    Do you know from Mr. Yajuin's information, how Mr. Mondragon got the money to pay him?

A.    I don't recall if he told me that or not as to if he actually knew how the money was received by him.

Q.    Now, you testified that Mr. Yajuin indicated that Mr. Mondragon hired him, correct; is that your testimony?

A.    Mr. Yajuin-Rodriguez was hired by Mr. Mondragon and then ended up -- yes, that's my testimony, yes.

Q.    What did he mean by "hire"?

A.    We have a vessel, would you like to be the chief

engineer on it, and I'm -- those are my words, Your Honor, I'm just --

Q.   Is this what Mr. Yajuin told you, that he was approached directly by Mr. Mondragon and offered that position?

A.   Ma'am, I don't remember the specifics, he just indicated that he was hired by Mr. Mondragon.

Q.   And Mr. Yajuin also worked on a vessel on a prior occasion?

A.   Say that again.

Q.   Did Mr. Yajuin also work on another vessel on a prior occasion?

A.   A prior vessel other than the Gatun, yes, Mr. Yajuin, yes, he indicated he had been on another merchant vessel.

Q.   And was he -- did he tell you who hired him for that vessel?

A.   My recollection is that for that prior vessel, he was hired by an individual named Orlando Nunez.

Q.   Not Mr. Mondragon, correct?

A.   Yes, not that prior vessel, I believe that's correct, yes, ma'am.

Q.   And did you do anything to verify whether he was, in fact, hired by someone else on that other vessel?

A.   Not specifically, no, ma'am.

Q.    When he referred to Mr. Mondragon as you said licensiado, L-I-C-E-N-S-I-A-D-O for the Reporter; is that how he referred to him?

A.    Yes, they were referred to by -- in that term.

Q.    When you say "they", Mr. Mondragon, was he referred to in that term?

A.    Yes, yes.

Q.    And what did you understand that term to mean?

A.    My understanding, and this was talking to other -- the crew members as I would interview them --

Q.    From Mr. Yajuin, what did you understand him to mean?

A.    Well, ma'am, I don't remember specifically if he -- if I actually asked the question, what does that mean to you, Mr. Yajuin, and so it was the general concensus of interviewing all the different crew members as to what they kept referring to him as, and that reference, as explained to them in the course of interviewing them was, these are the guys that are in charge, the bosses, the professionals.

Q.    Well, is that terminology known to you as anyone who would have any kind of a degree in anything?

A.    No, ma'am, again, I was just kind of relying -- I don't know that term and the crew members were telling me it's the los licensiados, those are the guys in charge.

I didn't make an effort to try to research that to see if that's an accurate word to be used for people in charge.

Q.    And regarding Mr. Yajuin, did you verify any of his personal data when you met with him?

A.    In --

Q.    Did he give you his correct name?

A.    I believe it was correct, yes, and I think almost all the crew members, we had their passports and so forth.

Q.    And is that how you verified who each individual was, through their passports?

A.    Well, we had the passports.  Now, they gave us their names, it matched the passports.  I really didn't call the Méxican Embassy or anything of that nature, no, ma'am.

Q.    Now, regarding Mr. Casares, he also said that he was hired by Mr. Mondragon?

A.    That's what he indicated, yes, ma'am.

Q.    What did you understand him to mean by the word "hire"?

A.    He employed him to work on the Merchant Vessel Gatun.

Q.    How?

A.    Again, this is my words, not his, but basically we have a vessel --

Q.    No, what did he tell you, sir?

A.    He said he was hired by Mr. Mondragon.

Q.    And what did he -- how was he hired?  Did he explain how he was hired?

A.    I don't recall in any great detail, he may have, I don't recall that.

Q.    Did he say whether he knew that Mr. Mondragon had an office, Marine Management?

A.    Specifically, I don't recall whether he said that or not.

Q.    By the way, did Mr. Yajuin say he knew that Mr. Mondragon had an office, Marine Management?

A.    He may have.

Q.    And did Mr. Yajuin go to the office for an interview by Mr. Mondragon?

A.    I don't recall if he told me that, it's possible.

Q.    Did Mr. Yajuin ever go to Marine Management office?

A.    Did Mr. Yajuin ever go to Marine Management office?

Q.    Yes.

A.    I don't know, he may have told me he did.

Q.    Well, if he said he was hired by Mr. Mondragon, where was he hired?

A.    Again, I don't know that I even asked him those specific questions.

Q.    And what about Mr. Casares, did he ever state that

he went to the office of Marine Management?

A.    Ma'am, he may have told me that in the course of the interview, I don't recall that.  He just indicated, and again, I was summarizing some notes from some reports that he indicated he had been hired by Mr. Mondragon.

Q.    Did he say he went for an interview?

A.    I don't recall that, but now that you've asked me, what I do recall is that Mr. Casares and Mr. Yajuin had both had a prior association with Mr. Mondragon and it related to working on that other vessel you had inquired about earlier, Mr. Orlando Nunez's vessels.  That was the association, that Mr. Mondragon had met them previously, both Mr. Yajuin and Mr. Casares had met them previously, and known them, and then when Mr. Mondragon was looking, or not him specifically, but as they were getting the crew together, he ended up --

Q.    How did he meet them at the prior occasion?  Let's start with Mr. Yajuin.  How did he meet Mr. Mondragon on a prior occasion?

A.    Mr. Mondragon had an association with Mr. Orlando through business, some type of association.

Q.    Did you ever verify that through any independent means other than Mr. Yajuin?  Did you get business records?

A.    No, I did not do that, no.

Q.    By the way, did you ever go to the Marine Management office or anyone from the DEA ever go there before the arrest?

A.    Not to my knowledge.

Q.    Did you ever pull any records from Marine Management to see when it was incorporated, how it was incorporated?

A.    I have not, no, ma'am.

Q.    Mr. Orlando Nunez, did you ever do a background check on Mr. Orlando Nunez?

A.    No.

Q.    Did you know the boat that they were talking about on a previous occasion, did Mr. Yajuin give you the name of a boat?

A.    I believe it was the Merchant Vessel Century Lion.

Q.    Did you ever do any independent investigation on the Century Lion?

A.    No.

Q.    Did the name "Mondragon" ever come up when you looked up the name "Century Lion"?

A.    I don't think it did.

Q.    Going to Mr. Valdez who is the captain, he also said that he was hired by Mr. Nunez?

A.    Captain Valdez indicated that he was hired by Nunez-Gutierrez, yes, ma'am.

Q.    And where was he hired at?

A.    It's my understanding, and it may have been -- again, I think I indicated earlier, Mr. Yajuin Rodriguez, I think, had referred the captain's name to Mr. Nunez, I'm not sure of the exact details, but eventually, Mr. Nunez-Gutierrez traveled to Panama and I think it was in Panama that that's where he first meets Mr. -- excuse me -- Mr. Valdez, in the course of getting hired, makes his way to Panama and that's where he actually meets Mr. Nunez face to face.

And then, after a discussion about the trip and what the job is going to entail and how much is he going to get paid, I think his recollection -- Mr. Valdez's recollection is the next day, Mr. Mondragon showed up in the lobby of the hotel indicating, hey, I'm Mr. Nunez's partner and at some point, I think they went off to the vessel.

Q.    To what vessel?

A.    Merchant Vessel Gatun.

Q.    Did captain -- did Captain Valdez ever go to the Marine Management facility?

A.    I don't know, I don't recall.

Q.    Did he ever say that he was interviewed or asked any questions about his capabilities to smuggle?

A.    I don't recall that, ma'am.

Q.    Did Valdez tell you he had been involved in another smuggle?

A.    In the course of interviewing Mr. Valdez, he did give me some historical information about other involvement.  I don't specifically recall what he told me, but he wasn't -- gave me some indication of some other activities he was involved in.  I don't remember exactly what they were.

Q.    Would you characterize Mr. Mondragon as an individual who had administrated this boat, the M/V Gatun?

A.    Would I characterize him as the administrator of the Merchant Vessel Gatun?

Q.    Yes.

A.    I would, yes, ma'am.

Q.    And would you also state that the M/V Gatun had other voyages or other trips that were of a non-smuggling nature?

A.    That's my understanding, yes, it did legitimate cargo runs, correct.

Q.    And as the administrator of the boat, do you know what his function would be?

A.    Mr. Mondragon?

Q.    Yes.

A.    It's my understanding that he was tasked mostly

with getting freight contracts, for example, if a company needed sand moved from Guatemala to Panama, he would be the one responsible for getting the contract to keep the vessel running 'cause the vessel, if it's not moving freight, it's not making money, but it's still incurring expenses.  So his job was to try to get business for the vessel.

Q.    When you spoke to Mr. Yajuin, did he know that to be Mr. Mondragon's function?

A.    I don't believe I went into great detail with Mr. Yajuin about what his understanding of what Mr. Mondragon's daily administrative duties were, so...

Q.    What about Mr. Casares, did you ever ask him what he understood Mr. Mondragon's function to be?

A.    I may have, ma'am, I don't recall.  I mean, we debriefed these gentlemen on several occasions.

Q.    An when you spoke to Captain Valdez, did he indicate to you what he understood Mr. Mondragon's function to be with the boat?

A.    Again, ma'am, we may have discussed that when interviewing these crew members, I don't remember specifically what the interviews entailed, but it was, again, my focus at the time of interviewing most of those crew members was trying to get into the background as to the smuggling operations.  I don't know whether that

necessarily would have been --

THE INTERPRETER:  Your Honor, the interpreter --

THE WITNESS:  Sorry.

THE COURT:  Go a little slower, please.

THE WITNESS:  My focus at the time when we were conducting those interviews would have been so much zeroed in on what their understanding of each of the Defendants' roles were in terms of administering the vessel.

BY MS. GEORGE:

Q.    Is it fair to say then that your conversations with Mr. Yajuin were not focused on Mr. Mondragon's role?

A.    His role -- it was focused on it in terms of his role as it related to the illegal drug smuggling aspect of this whole operation.  As to his specific role, you know, did Mr. Yajuin know every contract that Mr. Mondragon was negotiating for, no, not in this specificity regarding a legitimate side of the business.

Q.    But regarding the drug smuggling end of it, when you questioned Mr. Yajuin, were you focused on Yajuin or were you focused on Mondragon at the time?

A.    Oh, I think in the course of an interview, you're focusing on everybody that is related to the issue at hand, the drug smuggling trip, so I'm looking to know

what Mr. Yajuin did himself, I'm looking to know what Mr. Yajuin knew about other co-defendants, other people involved, looking to know what Mr. Yajuin saw, observed, heard, did, spoke to, conversations he had with the other individuals on the boat, what direction he was given.

Q.     And through all of that, apart from Mr. Yajuin's words to you, was there any independent evidence that he was hired by Mr. Mondragon?

A.     Independent as in, do I have an employment form or something like that?  I don't have that, I have what Mr. Yajuin has told me.  And again, interviews with the entire crew, and there was, again, certain lower-level individuals on the crews, the mariners who did not have any need to deal with the administrators, who would indicate they didn't have any dealings with them, some didn't know who they were, some said I didn't deal with them, but I saw them on the vessel, they would show up.

So in the course of interviewing all these individuals, it was clear to me these two gentlemen were administering the vessel, they were in charge of it, they got the crew, they arranged the routes, they coordinated the onloads.

Q.     Do you know, sir, if from Mr. Yajuin, himself, did Mr. Yajuin know where they got the routes from?

A.     I don't think Mr. Yajuin did know that, no, ma'am.

Q.    Did Mr. Yajuin know where they got the money to pay them from?

A.    I don't believe he knew that, no, ma'am.

Q.    Did Mr. Yajuin know whether they were acting at the direction of someone else in paying them?

A.    I don't think Mr. Yajuin knew that.

Q.    But there was, as you stated earlier, someone higher than them, correct?

A.    Yes, ma'am, that's my understanding.

Q.    They're not the owners of the -- Mr. Mondragon is not the owner of the narcotics, correct?

A.    That would not be my characterization, no, ma'am.

Q.    Did Mr. Yajuin know how much drugs were going to be on that boat when he accepted the job?

A.    I think for the November load, the successful November load, I believe there was some indication at the -- prior to the load getting underway, that they did give some indication to the crew members as to the size of the load, not with specificity.  I don't think there's a discussion as to exactly X number this, but they had some indication as to it's three tons or --

Q.    Going back to the first load, did Mr. Yajuin say that Mr. Mondragon told me with specificity it was going to be X amount of kilos?

A.    I don't recall that, ma'am.

Q.    You don't recall it or he never said that?

A.    Well, I don't recall it which means he could have said it and I may have written it down in my notes.

Q.    Is it on your notes now?

A.    It's not on the notes I have right here, no, ma'am.

Q.    Did Mr. Yajuin tell you that Mr. Mondragon knew exactly at what point those drugs were going to be picked up when he was, in fact -- when he, in fact, agreed to participate in that smuggle?

A.    No, ma'am.

Q.    The first one?

A.    Yeah, I don't know that he told -- I don't know that Mr. Mondragon told, with those specifics added, I don't believe he told that to Mr. Yajuin, it doesn't --

Q.    Did Mr. Yajuin tell you in this first smuggle that Mr. Mondragon knew the amount of money that -- the time that they would be paid?

A.    Did Mr. Mondragon know that?

Q.    Yes.

A.    I don't believe he indicated that to Mr. Yajuin.

Q.    Let's go to the second smuggle, the Gatun case. Did Mr. Yajuin tell you that Mr. Mondragon told him the exact amount of drugs that were going to be brought on that boat?

A.    Not the exact amount, but my recollection is

Mr. Yajuin and Captain Valdez did have a meeting with Mr. Mondragon and Mr. Nunez, and when they came back from the meeting, there was some indication as to the quantity that they were expecting to be delivered to the vessel.

Q.    Did he state that Mr. Mondragon knew with specificity the amount -- Mr. Mondragon, not anybody else, did he say that Mr. Mondragon said, look, we're going to do 500 --

A.    I don't believe he -- I don't recall him indicating that with specificity, no.

Q.    Did Mr. Yajuin tell you that Mr. Mondragon knew the exact location of the pickup?

A.    I don't recall him telling me that, no, ma'am.

Q.    Was there, in any of the evidence that you've culled, during your investigation of this case, was there any evidence to show that Mr. Mondragon knew before that vessel went out the quantity of drugs that were coming on?

A.    Again, I think I stated that there was some indication that they had indicated -- Mr. Mondragon and Mr. Nunez had indicated to at least Yajuin and some of the higher levels as to what -- a quantity to expect to be delivered.  As to whether he was told specifically -- did Mr. Yajuin specifically -- was he specifically told by Mr. Mondragon you're going to get X number of kilos

delivered, no, I don't believe with specifics he was told that by Mr. Mondragon.

Q.    Is there any -- in your investigation, was there anything that you independently found, a book, a ledger, that says that Mr. Mondragon knew before that boat went out, how much drugs were going to be on there?

A.    Not at this point, there's other records I'm still analyzing, but not at this point, no, ma'am.

Q.    Is there anything in your independent investigation that showed Mr. Mondragon at that point knew where the exact pickup was going to be of the drugs?

A.    Mr. Mondragon knew the route on which the rendezvous would have occurred.

Q.    What evidence do you have that, at this time when you were interviewing Mr. Yajuin, that shows he knew when that boat -- Mr. Mondragon knew when that boat was going out where the pickup would be?

A.    Now you asked me when I'm interviewing Mr. Yajuin?

Q.    Correct.  By that time, your investigation is completed except for the debriefing of the crewmen; is that correct?

A.    My investigation is complete except for the interviewing of the crew members?

Q.    Well, everyone is arrested at that point, correct?

A.    Yes, everyone was arrested at that point.

Q.    And they were arrested because some investigation was going on, correct?

A.    They were arrested based on some information that had been received that the Government acted on.

Q.    Correct, okay.  Up to that point, when Mr. Yajuin was speaking to you, what did you have in your hands that said Mr. Mondragon knew where those drugs were going to be picked up?

A.    Specifically, I don't think I had any indication that Mr. Mondragon knew the exact rendezvous location, but there were --

Q.    That's my question.

A.    The exact rendezvous location, I don't know that Mr. Yajuin would have been told that by Mr. Mondragon.  I don't recall that conversation or that information coming out that Mr. Mondragon told Mr. Yajuin.

Q.    Well, Mr. Yajuin is the chief mechanic or machinist, right, chief engineer?

A.    Chief engineer, yes, ma'am.

Q.    And in his capacity as the chief engineer, what does he do?  Isn't he the one who runs the engines, stops the boat, makes -- goes along the route?

A.    Yes, my understanding is the chief engineer's primary job is to make sure the engines are up and running.

Q.   And to also make sure that the engines are not up and running, correct?

A.   Yes, ma'am, he's the one operating the engines on the vessel.

Q.   So who would have to know when that boat is going to stop?

A.   He certainly would be -- he would not have to know in advance, conceivably, he could be called from the captain on the bridge and saying, guess what, we're stopping the boat tonight.

Q.   Did he tell you that he received instructions from Mr. Mondragon to stop the boat at a certain point?

A.   Did he specifically get those instruction from --

THE COURT:  Look, we could be here all day with you asking those questions.  Why don't you just tell me what he told you and then you can argue from that, Ms. George.  Other than that, we should have just tried the case.  I just want to know what he told him, and then if he doesn't tell -- then you can argue to me from what he didn't tell me.

MS. GEORGE:  The problem I have with that, Your Honor, is that he's generalizing what was told and he's not -- and the details are not there.

THE COURT:  Then you can argue, Judge, this is all he said.  But we could -- did he tell you this, no,

did he tell you that, no.  We could be here all day with that.

MS. GEORGE:  But those, I believe, are issues that are critical to whether my client had knowledge --

THE COURT:  So what, so what if your client -- if the evidence doesn't establish your client didn't know where the boat was going to stop and be off-loaded or --

MS. GEORGE:  Because it goes to the issue on his control whether or not he's a leader or organizer.

THE COURT:  If he's leading or organizing this little -- this crew here, so what?

MS. GEORGE:  If he is, I think that -- it's our position he's not, and it's our position he's not because he's -- because there's other people telling him what to do.

THE COURT:  Oh, so if there's someone above them, they can't be an organizer; is that what you're saying?

MS. GEORGE:  No, that's not what I'm saying, I'm saying that --

THE COURT:  That's what it sounds like to me.

MS. GEORGE:  No, that's not what I'm saying. I'm saying that under the law, as I understand it, if they have no control over the merchandize, no control over the participants, and it's our position that they

don't because they're being directed by other people, then what the Government is proffering --

THE COURT:  Are you going to put on any evidence to that effect today?

MS. GEORGE:  I wasn't prepared to do it because I wasn't sure where they were going with this point.

THE COURT:  Well, today is the sentencing hearing.  Just tell me what he told you, please.

How much more do you have?

MS. GEORGE:  Well, I wanted to find out with specificity what each of them told him and I'm not getting that.

THE COURT:  Tell us with specificity what each of them told you.

THE WITNESS:  Okay.  Mr. Mondragon, and this is being told to me during a debriefing of Mr. Yajuin-Rodriguez.  Mr. Yajuin-Rodriguez explained that Mr. Mondragon had somehow obtained Mr. Yajuin-Rodriguez's cell phone and called offering Mr. Yajuin-Rodriguez a job.

Mr. Yajuin-Rodriguez met with Mr. Mondragon, he indicated he was then hired to be the engineer aboard the Gatun.  Mr. Mondragon initially told him, told Yajuin-Rodriguez that he would be transporting drugs for which Mr. Mondragon-Garcia would be paid -- excuse me --

for which Mr. -- yeah, I have a typo here, but it's an indication that Mr. Mondragon told Yajuin-Rodriguez that they would be transporting drugs, yes, for which Mr. Mondragon was going to get paid $40,000, but I think the payment for Mr. Yajuin-Rodriguez's engineering fee, I don't recall exactly -- let's see, I might have it in my report here.

Yes, says during this time period that Mr. Mondragon told Mr. Yajuin-Rodriguez that it was to be a drug trip for which Yajuin-Rodriguez was to be paid $40,000.

In a later meeting in a restaurant, Mr. Yajuin-Rodriguez, the chief engineer, was upset about having the chief -- not -- his title as being the chief engineer.  I remember this now, but there was a -- Mr. Yajuin-Rodriguez was a little bit upset about his title on the vessel and that leads him to have a separate meeting with Mr. Nunez-Gutierrez.

In that meeting, Mr. Gutierrez indicated to Mr. Yajuin-Rodriguez that he was going to be paid 40,000 and the reason it was going to be 40,000 was because it was described to be a simple job where the drugs were going to be put inside a container and that should alleviate any problems.

Sometime after that discussion with the two

Defendants, Mr. Nunez-Gutierrez told Yajuin-Rodriguez that he was going to be instead paid $70,000.

THE COURT:  Is that all you can recall that Mr. Yajuin-Rodriguez told you about these two Defendants?

THE WITNESS:  Well, Your Honor, there's been quite a few debriefings I had, there's a lot of information and I could read my reports all day, I guess, on the stand here.

MS. GEORGE:  Can I just ask one question, Your Honor?

THE COURT:  Go ahead.

BY MS. GEORGE:

Q.    Apart from everything that they told you, that Mr. Yajuin told you, is there anything that you had that independently verifies anything that he told you?  You have records that verify what he says?

A.    Well, I have other testimony, I have other statements from other witnesses that tends to corroborate the statements from these crew members that I've been referencing.

Q.    And these are crew members that we're talking about -- you're talking amongst all the crew members, correct?

A.    I have crew members on the vessel Gatun, the initial batch of arrestees, and I have other information from other witnesses that tends to corroborate what those

crew members have told me.

Q.    Fair to say, though, that the crew members on certain details were very inconsistent; is that correct?

MR. MURRAY:  Objection, Your Honor, form of the question.

THE COURT:  Inconsistent with what?

MS. GEORGE:  Let me follow-through with that.

BY MS. GEORGE:

Q.    As an example, the crew members gave you various versions as to how the onloading occurred, correct?

A.    Yes.

Q.    And are they all consistent in that version?

A.    There are discrepancies in certain details. Everybody's memory is a little bit different, but the overall operation, everyone was consistent on that.

Q.    But true to say that one said the boats that came were three boats that came, someone said 15 boats or 10 boats that came, they're inconsistent, correct?

A.    There were some inconsistencies, yes, ma'am.

Q.    And were they inconsistent -- did you check their consistency in terms of what they said about Mr. Mondragon?  Did they all meet with Mr. Mondragon, all these people we're talking about, did they all meet with him at some point in time?

A.    No, like I indicated earlier, the lower-level

mariners on the vessel indicated some didn't ever even saw them, several of the other ones said, yes, I saw them, I had no interaction with them, but we talked amongst ourselves and the talk amongst ourselves were, those are the guys that are in charge.

Then in terms of the higher-level individuals on the vessel, the chief engineer, first officer, Captain Valdez, the boatswain, those are the individuals that I indicated have had face-to-face meetings with them where you're hired by them or either paid by them, so there are some inconsistencies, but there's a lot of corroboration as well.

Q.   But yet, these people had no knowledge as to where any of the funds came from, or where any of the directions came from; fair to say?

MR. MURRAY:  Objection, Your Honor, form of the question; these people, and I don't know who she's talking about.

THE COURT:  Are you talking about the crew members?

BY MS. GEORGE:

Q.   The higher -- let's talk about the higher levels that you're referring to, Yajuin, the captain; did they know where Mondragon or Nunez received any of the funds from?

A.    I don't believe I recall them telling me that, that they knew.

Q.    Did they know where Mondragon or Nunez received directions for the routes?

A.    No, I don't believe they knew that information.

Q.    'Cause they didn't make up the routes, correct? Neither Mr. Mondragon or Mr. Nunez created the routes; am I correct?

A.    Well, it's my understanding that they were told where the drugs were to be picked up and where they were to be delivered and it was their responsibility, or at least Mr. Mondragon, who had the expertise in getting freight contracts to arrange so there was a legitimate reason for that vessel to be moving from point A to point B.

Q.    Did Mr. Mondragon have control over the amount of drugs that were going to be placed on the boat?

A.    No, ma'am, I don't believe he did.

Q.    Did he, Mr. Mondragon, have control as to where the stops were to be made on the boat?

A.    I don't think he had that control, no, ma'am.

Q.    Did Mr. Mondragon have control over where the drugs were to be picked up from?

A.    No, again, I believe they were told that it's going to be, you know, the vessel needs to be picking up the

drugs from this particular country.

Q.    Did Mr. Mondragon organize the packaging of the drugs and the placement of the drugs on the boat?

A.    I don't believe he did, no, ma'am.

Q.    Did Mr. Mondragon set the prices to be paid to the crewmen?

A.    I don't think he did, ma'am.

THE COURT:  Let's cut to the chase here.  At the very --

MS. GEORGE:  I have nothing further.

THE COURT:  Even assuming I accept your argument, why wouldn't they be at least entitled to a three-level enhancement for being a manager or supervisor?

MS. GEORGE:  Well, Your Honor, that's why I want to make the distinction because the Probation, first of all, is recommending four levels.

THE COURT:  So?  They get three levels.

MS. GEORGE:  But my point is that they had -- we're arguing that they should be entitled -- my client should be entitled to no role enhancement because he had no control under the law.  And I think he had no control over the participants --

THE COURT:  Ms. George, please, please, please, don't insult my intellectual intelligence.  Are you

telling me that these two gentlemen, under the facts presented, should be treated the same as the crew members and face --

MS. GEORGE:  At least the captain, and I'll tell you -- let me proffer why, Your Honor.  This is a situation where my guy administrates a boat, and what does he do is, he says, okay, you know what, I'm going to make some money on this, you do what you want with my boat.  You want to put drugs on it, go ahead, put the drugs on it, I don't need -- you know, do what you want with it and I'll provide you the boat, okay.  He's no different from the captain.  In reality, he's no different from the first machinist.

THE COURT:  What you're saying is a two-level enhancement, at the most.

MS. GEORGE:  I would say at the most, Your Honor.  I can't fathom how those people could be the leaders and organizers of them when they don't know the price, they don't even know how much drugs are going to come on, they don't know where it's going to come on.  They're nothing more than saying, you know what --

THE COURT:  They're managing it, someone from higher above says, listen, this is what we want to do, you carry it out for us.

MS. GEORGE:  That's right.  And do you think,

Your Honor, that in the situation of these -- the amount of money that they're talking about here, had they known that 19 tons were going to come on that boat, that everyone was going to do this for that kind of money?

You know, the other cases prior to this, the other situations, the other smuggles are less amounts and similar money or more money.  So, I think that that's indicative, too, of the fact that they don't even know what's coming on the boat.

Yeah, they want to make their money, yeah, they're involved in criminal activity, but to hit them at a level as a leader and organizer when they're really in the same position as the captain of the boat because my client is not indispensable, the captain is.

THE COURT:  Your client is not indispensable; he's providing the boat for God sakes.

MS. GEORGE:  Yeah, but if it's not my client, they can get another boat.

THE COURT:  Okay.  Well, but the facts are, he got the boat for them.

MS. GEORGE:  That's right.

THE COURT:  First of all, do you have any other questions of this agent?

MS. GEORGE:  Not with respect to this, Your Honor, I don't.

THE COURT:  Mr. Batista, do you have any questions.

MR. BATISTA:  Yes, Your Honor.

THE COURT:  Be brief, please.  Do not -- well, no, if it's going to take a long time, we'll be here this afternoon, all right.  If I would have known it was going to take this long, I would have set aside more time.  Go ahead.

MR. BATISTA:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. BATISTA:

Q.    Sir, the information that you're relating to the Court is you're taking at face value what these individuals told you once they were arrested aboard the boat, correct?

A.    Yeah.

Q.    Yajuin, for example, you're accepting his version to you as to who hired him and the circumstances under which he was hired, correct?

A.    Yes, sir.

Q.    Okay.  Did Mr. Yajuin, in his debriefing, also tell you that he was previously involved in a smuggling that involved thousands of firearms and tens of thousands of ammunitions?

A.    I don't recall if he told me that in the specific

debriefing with him, but that information has surfaced in the course of this investigation.  I think there's a newspaper article or something to that effect that had been provided.

Q.    Right.  But when you interviewed that individual, Yajuin, he did not make reference to that; correct?

A.    I don't recall him mentioning that, no, sir.

Q.    Okay.  Now, didn't Mr. Yajuin tell you that he was previously working aboard that Gatun as an assistant engineer and then once the chief engineer left, he became the chief engineer aboard the boat?

            MR. MURRAY:  Objection, Your Honor, relevance.

            THE COURT:  No, I'll overrule the objection.

            THE WITNESS:  Sir, I don't recall specifically what -- I don't recall specifically how that transpired, but he ultimately ended up, I believe, being the chief engineer for the Gatun.

BY MR. BATISTA:

Q.    Right.  Did Mr. Yajuin tell you that before he left México, he knew that he was going to Panama to work on board that boat in connection with a drug smuggling venture?

A.    Did he tell me that he knew that before he left México?

Q.    Yeah.

A.    He may have told me that, I'd have to re-read my entire debriefing reports of him.

Q.    Okay.  How about Valdez, the captain?  Didn't he tell you that before he left México, he knew that he was going to be involved in a drug venture?

A.    Again, sir, he may have told me that.  I just happened to review a particular debriefing of him, prior to coming here, where he indicated that he recalls meeting Mr. Nunez-Gutierrez upon arriving in Panama, face-to-face at a motel where he was then told about the trip.

Q.    What I'm asking you is, did he tell you that he knew in México before going to Panama that he was going to be participating in a drug smuggling --

A.    Did Mr. Valdez tell me that?

Q.    Yeah.

A.    I don't recall, it could be in the reports here.

Q.    How about Goveo; did he tell you that?

A.    I don't recall, sir, he could have told me that.  In the course of debriefing, it could be in there that they knew, it could be that they didn't find out till they got to Panama.

Q.    Now, your understanding is, of this situation, that the people who owned the boat was not Mr. Nunez, correct?

A.    Yes, that's correct.

Q.   And it's not his boat, I mean the Gatun, correct?

A.   That's correct, it's my understanding it's not his boat, no, sir.

Q.   Now, you were told that Mr. Nunez delivered monies to pay these individuals for the first successful smuggling venture, correct?

A.   I think I indicated that earlier in my testimony that Saragosa-Goveo had told me in the course of debriefing him that Mr. Nunez-Gutierrez had arrived at his house with a suitcase full of cash that was to be used to pay the other crew members.

Q.   And that Yajuin told you that his wife received money from Mr. Nunez?

A.   Yes, sir, I indicated that Yajuin had indicated that for that first successful load, that the money was paid to his spouse in México by Mr. Nunez-Gutierrez.

Q.   Okay.  Now, did he pay the money or did he deliver money?

A.   Well, he delivered -- he delivered a quantity of cash is my recollection to the spouse.

Q.   And based upon your investigation, is it your position that the person who made the determination of how much money the different crew members was to be paid was Mr. Nunez or was that decision made by somebody else?

A.   As far as Mr. Nunez, again, I don't recall if he

was the one that told each individual you're going to get X. I'm not exactly sure when they were hired -- well, let me -- give me just a moment.

Q.    Listen to my question. What I'm asking you is, based upon your investigation, is it your understanding that Mr. Nunez is the one that made that determination or was Mr. Nunez related information or following orders that he was given as to what the breakdown would be as to the different people?

A.    Whether he made the determination or was following orders, I don't know the answer to that question. He was -- my information from the debriefing of the Defendants was they were told by Mr. Nunez you're going to be getting this. Now, did he make that determination unilaterally on his own; I don't know or was he told.

Q.    As far as hiring any of these individuals, is it your understanding that Mr. Nunez was the person that had the final say or he was following instructions as to who to hire?

A.    Did he have the final say?

Q.    Yes.

A.    I certainly would think --

Q.    No, that's not my question what you would think. I'm asking you, based upon your investigation, did Mr. Nunez have the final say in who was hired and how

much money was to be paid for each of these individuals?

A.    Not the amount of money, again, I'm not clear on that, but I certainly think he could say he's not going, he's going.

Q.    How about the money, the breakdown.  Your understanding is that the captain made $100,000 for the first venture, correct, on the Gatun?

A.    I believe that was what the figure was for the November load, yes, sir?

Q.    And Yajuin was paid $80,000 for the first trip, correct?

A.    Yes, that sounds -- I don't have the exact -- yes, I believe the captain was in the 100,000 range, the chief engineer was in the 80,000, something like that.

Q.    Right.  And Goveo was paid around 60 to $70,000 for his participation in the first venture?

A.    Is Jose Goveo -- I'm sorry -- Jose Saragosa or Roberto?

Q.    Jose?

A.    Jose; I think if you want to give me a minute, I might be able to check that, I don't know if I -- Mr. Jose Saragosa indicated that he and his brother, Roberto, were each paid $30,000 or were to be paid $30,000, they actually had got it in two installments, but each was getting 30,000 for that November load.

Q.    Well, two installments; didn't you just indicate a minute ago that a briefcase full of money was delivered to that individual on one occasion?

A.    Yes, I did indicate that.

Q.    And isn't it your understanding that Mr. Nunez was paid 60,000 for his involvement in that particular first venture?

A.    Mr. Nunez's payment for the first load, it's my recollection, I think, that Mr. Nunez, and I'd have to go back and look through my notes, I don't believe I have those with me, but it's my understanding he was paid 90,000 for the first load and Mr. Mondragon was paid 60, and again, that's my recollection.  I'd have to go back and look through my notes to verify that.

Q.    So Mr. Nunez was paid, based upon your investigation, less than the captain?

A.    Yes, I believe that was correct, yes, sir.

Q.    Now, you're sure it was 90 and not 80?

A.    I'm not sure, again, if I could go look at my notes I can maybe get a better answer, but it was in that range.

Q.    Okay.  So let me ask you, the money that these individuals were paid was based upon having a successful drug venture from one point to México, correct?

A.    That's a reasonable way to describe it, yes, sir.

Q.    Okay.  He did not -- he -- that money was -- did not correlate -- the payment -- did not correlate to the amount of drugs that ultimately would be successfully imported, correct, based upon your understanding?

A.    Yes, I think that would be correct.

MR. BATISTA:  One second Your Honor.

No further questions, Your Honor.

THE COURT:  Mr. Murray, you have any redirect?

MR. MURRAY:  Just one question, Your Honor.

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. MURRAY:

Q.    Special Agent Ferebee, in your training and experience, is $20,000 per kilogram a conservative wholesale value for cocaine?

A.    Yes, sir, the prices fluctuate, but that would probably be a fair amount.

MR. MURRAY:  No further questions, Your Honor.

THE COURT:  All right, thank you, Agent.

THE WITNESS:  Thank you.

THE COURT:  Any other witnesses, Mr. Murray?

MR. MURRAY:  No, Your Honor, we're prepared to proceed to argument.

THE COURT:  Ms. George, you have any witnesses?

MS. GEORGE:  No, Your Honor.

THE COURT:  Mr. Batista?

MR. BATISTA:  No, Your Honor.

THE COURT:  All right.

THE INTERPRETER:  Your Honor, the Interpreter has been going one hour non-stop, and for accuracy, I would require at least a 10-minute break.

THE COURT:  You got it, Mr. Marino.

All right, let's take a break.

I want to be clear on something, have you been interpreting for Mr. Mondragon?

THE INTERPRETER:  I've been Interpretering for both.

THE COURT:  For both of them, okay, all right. I know we don't have the headsets, but Mr. Mondragon, have you heard everything?

DEFENDANT MONDRAGON-GARCIA:  Yes, sir.

THE COURT:  Understood everything?

DEFENDANT MONDRAGON-GARCIA:  Yes, Your Honor.

THE COURT:  In fact, you understand English, don't you?

DEFENDANT MONDRAGON-GARCIA:  Yes.

THE COURT:  And you speak English?

DEFENDANT MONDRAGON-GARCIA:  Yes, I do.

THE COURT:  Mr. Nunez-Gutierrez, have you understood everything?

DEFENDANT NUNEZ-GUTIERREZ:  Yes.

THE COURT:  All right, just wanted to make sure.

All right, we'll come back at 10:25.

(Brief Recess.)

All right Mr. Murray.

MR. MURRAY:  May I proceed?

THE COURT:  Yes, sir, you may.

MR. MURRAY:  Your Honor, as to the Defendants' objections to the four-level enhancement for being an organizer or leader under Section 3(b)1.1 of the United States Sentencing Guidelines, I would first direct the Court's attention to the factual basis that these Defendants pled to.

In the first paragraph, of both Defendants' notice of maximum penalty, elements of offense and personalization of elements and factual basis, it states as to both Defendants that the Defendant and his co-Defendant conspired to smuggle cocaine by participating in brokering cargo and cargo containers and placing that cargo on certain vessels destined to México from Panama and elsewhere.

THE COURT:  Where are you?

MR. MURRAY:  I'm at the -- I'm reading specifically from the factual basis on Nunez-Gutierrez,

Your Honor.

THE COURT:  Okay, and I have that, it's at Docket 102 of the Court file.  We're on the second page?

MR. MURRAY:  Second page, Your Honor, first paragraph, third sentence, that the Defendant and his co-Defendant conspired to smuggle cocaine by participating in brokering cargo and cargo containers, and placing that cargo on certain vessels.

So Your Honor, we start from the point that these Defendants admitted to brokering cargo.  If we take that admission or that factual basis that's uncontested that they pled to, with all the facts of paragraph two, which describe somewhat the nature of the operation on board the Motor Vessel Gatun, that this is a freighter, and it was interdicted carrying over 19 tons of cocaine, and if we go back also to paragraph one where they talk about a prior trip or they admitted to a prior trip involving three tons, based on the factual basis and the reasonable and obvious implications of the factual basis, the four-level enhancement is appropriate.

They admitted to being brokers of cargo and cargo containers.  That implies leadership, it implies organization.  You know, taking a ship, you need to have it to be at a certain place at a certain time, you need people at a certain place and a certain time, you need

people knowing what's going to happen and you need to get the cocaine and move it onto the ship.

So they've essentially admitted the facts needed for the the four-level enhancement.  Now there's not a mathematical test as to whether it should be four points or three points, but the Application Note 4 gives us factors, and I would submit that the most important factor is the nature.  And in this case, we have quantity.  You know, that gives us some sense of the nature of the operation, 19 and a half tons, the first or second largest maritime cocaine shipment in history.

So given that fact, with what they've admitted, the four-level enhancement would be properly applied. And I would say it's only been augmented and supplemented by the testimony of Special Agent Ferebee who testified that four senior members on the Gatun, the first machinist, the engineer, the captain and the boatswain acted at the direction of the Defendants, were paid by the Defendants and recruited and managed others in that operation.  That's consistent with what they've already admitted, again, to brokering cargo.  It's the reasonable and necessary steps to carry out the conduct that they've admitted.

So I would submit not only that the four-level enhancement is appropriate, but in fact, the arguments of

counsel and the objections they have raised in the PSR amount to a frivolous conduct contest of relevant conduct.

We've heard today, Your Honor, that counsel have objected to quantity, knowledge of the operation, pickup locations, all of those objections, all of those arguments are frivolous contests of relevant conduct that either the Defendants admitted by brokering cargo or the reasonable implications of those admissions.

So all this argument we've heard suggests that the Defendants should not only receive the four points, they should receive no credit for acceptance of responsibility, specifically the two levels from the Court.

Application note 1-A, Section 3(e)1.1 suggests that if a Defendant falsely denies or frivolously contests relevant conduct, that Defendant has acted in a manner inconsistent with acceptance of responsibility. So I would submit those objections and these arguments are inconsistent with acceptance of responsibility because they're frivolously contesting relevant conduct that they have admitted.

As to the Defendants' objection for the Government not moving for the third level, this is entirely within the Government's discretion.

THE COURT:  You don't make the motion, there's not one thing I can do about it.  Just says if you decline to make a motion for substantial assistance, there's nothing that the Court can do about it unless the Defendant can prove that your motivation is driven by discriminatory intent, and I don't find any discriminatory intent here by analogy.  So you don't have to argue that.

MR. MURRAY:  Yes, Your Honor.  I would just finally ask the Court for a sentence within the advisory guideline range, but I would submit that that sentence should not be at low end of that advisory guideline range given the nature of this operation, again, 19 and a half tons, an extraordinary quantity of cocaine, and these Defendants are above an organizational level of the many, many boat Defendants you have sentenced, Your Honor.

THE COURT:  All right.  Ms. George?

MS. GEORGE:  Thank you, Your Honor.  I'm not sure whether -- I haven't seen any case law that says you can imply leadership when someone pleads guilty to conspiring in a drug conspiracy, but be that as it may, that's what the Government, I believe, is suggesting.

I'm saying from the facts here, we need to look at it more directly as to what actually occurred here. They pled guilty, openly, without a plea agreement, they

accepted their responsibility, they said that they conspired to participate in this smuggle and they did.

The question of enhancements is something completely different, and as I suggested to the Court earlier, my argument and the reason why I want these facts to be brought forward is that we're not necessarily stuck on the four levels.  The Court does have a lee way in there if the Court does believe from Mr. Mondragon that he should --

THE COURT:  Are you seriously suggesting to me that in light of the factual basis that each Defendant pled guilty to, because I remember, do you dispute any of those facts, no, I sure don't, those are the facts, and in light of the testimony that's been given to me by the agent, are you seriously suggesting to me that they should receive no role -- upward role adjustment?  Are you seriously suggesting that to me?

MS. GEORGE:  No, Your Honor, I'm saying that Your Honor has lee way --

THE COURT:  Two, what you want is two levels to put him on the same level as the captain?

MS. GEORGE:  Exactly.

THE COURT:  And then they still don't receive the safety valve.

MS. GEORGE:  That's correct.  That's what I'm

saying because I think the facts are clear here.  They got less money than the captain, they didn't know any of the specifics and the agent is candid enough to admit that on the stand now, that they didn't know a lot of what went on here.  There were higher people involved here, that's obvious, that's obvious, and Your Honor's question before to me was, do I think they cannot be organizers; no, obviously not, but I'm saying there is a space within which this Court has discretion to at least put them on par with the other -- with the captain, and I think --

THE COURT:  Didn't they make the payment to people, didn't they hire the people?

MS. GEORGE:  No, our contention is they didn't hire them, they were told that these people would be coming to work on the boat, the people went to see them.  They were given the money to pay the people, they paid them.  If you want to say they paid them to that extent, it's a question of whether they paid them or they delivered the money.  They simply delivered the money.  They weren't the ones saying, okay, you, sir, you qualify to be the captain on this boat, you're going to come on and I'm going to pay you I think, let me think, 80, no, I'll give you $85,000.  That was not within their purview.

So, what they did is they acted at the discretion of others that said, listen, I got this guy, he worked on a smuggle before, we're going to put him on this boat, and this is who's going to be the captain.  Of course, he has to know who the caption is.  They're administrating the boat, but that doesn't mean they picked the captain, that doesn't mean that they paid the captain.  There's no records to indicate that his came out of their own Marine Management account.

The ledgers just show that they were paid. They were -- the money was delivered to them.  That's a big difference.  And I submit, Your Honor, that had Mr. Mondragon known that this boat was going to carry 19 tons, I think he would be greatly ridiculous to say, okay, I'm going to get 60 to $80,000 to administrate this voyage.  It doesn't make sense.  I don't think anyone in their right mind would -- I don't think anyone in their right mind would do this anyway, but be that as it may, they're in it, if they're in it for the money, certainly knowing the specifics would be in their best interest, and they don't know it.

They don't know it for many reasons because the owners of the drugs don't want to involve them, they don't want to have to pay them more, they want to cut them off and the other thing that's important here is

that when these two individuals were arrested in Panama, there were two other individuals who were in Panama and who got away.

THE COURT:  Hold it, hold it, hold it, excuse me, excuse me.  If you want to put on evidence, you do that.  I don't know about any other individuals.  I know about these two gentlemen.  All right.  I don't know about any other individuals who escaped apprehension, and so what.

MS. GEORGE:  I'm just saying that there were others involved in the decision-making process.

THE COURT:  There's no question about that, Ms. George, there's no question about that.

MS. GEORGE:  All right.  So that's all I'm saying, and I think that the Court has discretion within the range on role what to impose and to -- and I'm asking the Court to put them on par with the captain of the boat because really if you see -- and the agent admitted, the captain got paid the most money, to me, he's the indispensable party, not our people, and I would -- that's with the issue of role.

Your Honor, there were other -- I understand the Court's position concerning the other level, so I don't need to go over that.

We're just on the guidelines right now,

correct?

THE COURT:  That's right, we haven't come to 3553(a)1 through 7.

MS. GEORGE:  All right.  So basically, those were the objections that I made concerning the offense conduct and how it should read.

And I also had another objection on the offense conduct that I wanted the offense conduct not to always be Mondragon and Nunez because their roles were completely different.  And so I think that when I placed my objections on the record is that I was specific to Mondragon doing whatever as opposed to not Mondragon and Nunez because there were different functions.

THE COURT:  Mr. Batista.

MR. BATISTA:  Your Honor, briefly, I will adopt Ms. George's argument on behalf of my client.

Your Honor, under the facts of this case, Your Honor, I believe a two-point level increase for role would be appropriate as to Mr. Nunez.

Judge, the Government is trying to put in your mind that based upon the fact of the amount of drugs that was seized, that therefore, the client should be punished based upon the fact that one of the biggest drug interdictions in the history of --

THE COURT:  Don't even go there, that's not fit

for fixing the guidelines.  It's already been taken into account with regard to quantity.  That's a 3553(a)1 through 7 argument.

MR. BATISTA:  Yes, Your Honor.  Your Honor, if I may, my client, at no time has he denied his involvement in the case.  The issue is what did he do, what was his role.  And Your Honor, I submit to the Court if his role was higher than the captain, then he would have made more money than the captain.  He got paid less money than the captain because his role was not higher than the captain.

The amount of drugs that was placed aboard the boat was not something within his control.  His job was to participate in providing certain information, following orders that he was given.  And the amount of drugs that ultimately wind up on that vessel was based upon how many fast boats get to that vessel at a particular location on the high seas and would be loaded on the boat.  His payment would be based upon the successful part of the trip, not the amount of drugs that will be smuggled -- successfully smuggled into México.  And I respectfully suggest to the Court that a two-level increase is the appropriate role.

THE COURT:  All right.  Thank you very much.

MR. BATISTA:  Thank you.

THE COURT:  All right, having listened to the testimony, having reviewed again the factual basis which both Defendants admitted to, specifically that part of the factual basis in which they admitted that they conspired to smuggle cocaine by participating in brokering cargo and cargo containers and placing that cargo on certain vessels destined to México from Panama and elsewhere, I will determine that an upward role adjustment is appropriate.

First of all, I will credit the testimony given to me by the special agent.  I see nothing to indicate that the statements given to him by the co-conspirators at the various debriefings were other than reliable, so I will credit that testimony.

It seems to me, you know, the argument's been made that these Defendants should be on the same level or par, if you will, as the captain, but in my mind, you cannot have a boat -- a captain without a boat, and what these gentlemen did was they supplied the freighter.  In my mind, I think that a three-level upward adjustment for being managers and supervisors in this venture in which more than five people were involved is the appropriate upward adjustment rather than the four level.  So I will sustain their objection only to that extent.  They will be afforded a three-level upward adjustment for being a

manager or supervisor of the 3(b)1.1(b.

Second of all -- well, that resolves the safety valve objection because they are not entitled to the safety valve based on that finding.

With regard to acceptance of responsibility, Application Note 6, second paragraph, of 3(e)1.1 says, because the Government is in the best position to determine whether the Defendant has assisted authorities in a manner that avoids preparing for trial, an adjustment under Subsection B may only be granted upon a formal motion by the Government at the time of sentencing, and it cites Section 401(g)2(b) of Public Law 108-21.

The Government has declined to make the motion and I find there's obviously a sufficient basis for that because these gentlemen did not plead until the day of trial, requiring the Government to bring witnesses, including Coast Guardsmen from out of state, and to prepare for trial, so that objection is overruled.

With regard to the objections to paragraphs eight and 16, the factual statements, I decline to amend those paragraphs.

All right.  I will, therefore, find the total offense level is what; 39?

THE PROBATION OFFICER:  Correct, Your Honor.

MR. BATISTA:  Yes, Your Honor.

THE COURT:  Criminal history category is one, advisory range of imprisonment is 262 to 327 months. They're subject to five years of supervised release, the fine range is 25,000 to $8 million and there's a $200 mandatory special assessment.

All right, Ms. George, I'll hear you with regard to the statutory factors.

MS. GEORGE:  Thank you, Your Honor.

Your Honor, basically what I wanted to point out in the brief I submitted to the Court is that -- is two main factors.  Number one, this is a crime that took place, while the amount of drugs were high, this was -- there was no violence involved in this case, and -- nor has there been any violence alleged by any of these individuals, specifically as I speak, concerning my client, Mr. Mondragon.

He's 38 years old.  I also attached to the Court some studies that have been done on recidivism, and based on the amount of time in the guideline range that is here, this is certainly a situation where he's in criminal history one and that he is deemed to be the type of person that recidivism would be very, very, very low.

And regarding also other issues that face him, deportation consequences, since he's not a citizen of the

United States, he will in one sense be caused to do more time than any other citizen Defendant by virtue of the fact that he will be placed in proceedings to be removed from the United States which will cause him to spend more time in jail than anyone else -- any other citizen similarly situated at whatever sentence he's given.

He also loses good time credit for each year after the first 12-month period, which is about 54 days. I know he's been in for about 17 months or 16 months now, but this year period, he will lose those 54 days of good time credit when he does go to a designated facility.

And I brought that out to the -- brought that to the Court's attention concerning the time that he spent in pre-trial detention.  He also spent some time in pre-trial detention in Panama where the conditions were horrendous in Panama and then was brought to the United States.

Another issue for the Court's consideration is that he has, in fact, he's incarcerated, while he's incarcerated in the County facilities here, these are pre-trial detention facilities which do not have the same type of courses and provisions available to him that a post-sentence facility does.  So he's spending a lot of time indoor, he's spending a lot of time with limited educational services, with limited activities.

Also, for my client, that the fact that his family is all located in México, the visits to the United States are extremely limited.  In fact, his wife has only been able to come here on one occasion and the visits at the County facilities, as the Court is well aware, are by window visits or non-contact visits.  This is something that is also a little different had he been placed in a Federal pre-detention facility or even after sentencing.

So I think -- I would like the Court to consider those factors, that the type of incarceration that he faces, for the length of time factors has some things that go along with it that are different from a United States citizen that can have his family come and visit, who can sit in a facility, have a cup of coffee, have a sandwich, have some conversation and at least continue the familial relationship.

I supplied to the Court and I know we supplied it very late, Your Honor, and I apologize, letters from the family, but they were only being sent to us during the week and we had to have them translated.  We translated as many as we could.

Just to attest to his background and character, he's a person who is well liked in the community, he's always been responsible to his family and he's a person that the community continues to support today even

knowing the circumstances of what he's facing.

I think that the need to impose a sentence in the guideline range, which is very high, is not necessary in this situation where he could possibly be on the same level as when we go to talk about disparity in sentencing, as the captain in this case.

I conceivably see no difference between him and the captain. And I know Your Honor says that without the boat, they couldn't do anything. That's true, but there is a lot of boats that are available. And these captains go from ship to ship and they make it their job to do these kind of smuggles.

This is a situation where the opportunity is given to these people, they grabbed it, they did it, you know, obviously, it was something that should not have been done, but nonetheless, I don't think it makes them any different from the captain.

My client worked administrating boats for years. He did many legitimate trips with this vessel as the the agent testified to. He also has participated in various business ventures that have no illegal tone to them at all.

So, what occurred here, it's this trip, it was a prior trip, we've admitted to that and he's accepted his responsibility fully. I would ask that the Court

consider a sentence below the guideline range and on par with that of the captain based upon the factors under 3553.

THE COURT:  Mr. Batista.

MR. BATISTA:  Yes, Your Honor.  Your Honor, I also received letters from my client's family on Monday of this week, although they're dated in March, I don't know why it took so long for those letters to get here, and I tried to have them translated as quickly as possible, yesterday, I tried to get them to the Probation Officer, but for whatever reason, my FAX did not go through and I provided a copy to the Court this morning.

I don't know if the Court had the opportunity to review them, but if you have, you will see that Mr. Nunez is 37 years of age.  All these family members and friends who have known him throughout, in a sensitive period of time, can attest to the type of person that he is, and aside from this unfortunate situation we're in, he finds himself before the Court.  Mr. Nunez has never had any type of contact with the Criminal Justice System in México or any other country.

Your Honor, the factors that the Court should look at in -- under 3553 are the factors that are to assist the Court in determining what is a just punishment for the Defendant's actions in the case before the Court.

Case 8:07-cr-00119-RAL-MAP   Document 131   Filed 09/08/08   Page 76 of 89 PageID 703
76

Also, obviously, to reflect the seriousness of the offense, promote respect for the law and the need for deterrence.

Your Honor, there are individuals that even if they are only locked up for one hour or for one month, that's sufficient deterrence and they know -- they learn that one of the most cherished possessions that a person can have in this world is his freedom.

Mr. Nunez is the father of two small children, and he's going to be away from his children for many, many years, regardless of what sentence the Court imposes.  He loses -- he's going to lose, because of his actions, the ability to see his kids grow.  Because of the advanced age of his parents, there's a strong likelihood that once he does get out and return to México, the chances are that his parents will probably have passed.

I respectfully ask the Court to sentence Mr. Nunez to the least amount of time possible that the Court deems appropriate, and that the Court deems is fair punishment and fair in this case.

The captain was initially sentenced to 245 months in jail.  I respectfully ask the Court to consider sentencing Mr. Nunez to a similar sentence or six or nine months more than what the captain was sentenced to.

I submit to the Court that based upon reading those letters from family members of Mr. Nunez and from speaking to Mr. Nunez, Mr. Nunez has learned his lesson. And unfortunately, it took him to be in this particular predicament to realize that one of the most precious things you have in life is freedom and family, and he has lost both.  His family, however, is standing by him, but we don't know what tomorrow will hold because of the age and circumstance of these individuals, and I respectfully ask the Court to sentence him accordingly.  Thank you.

THE COURT:  Mr. Mondragon-Garcia, is there anything you care to say to me before I impose sentence?

DEFENDANT MONDRAGON-GARCIA:  Yes.

THE COURT:  Do you need the Interpreter?

DEFENDANT MONDRAGON-GARCIA:  Yes.

Your Honor, I acknowledge that I have committed a mistake, having accepted to do an illegal job.  All my life I have tried to be an exemplary citizen, I have received many showings of affections and distinctions on behalf of my students at the university, (Defendant crying), my family, my friends and all the other people who know me for many years.

I hope that Your Honor will give me a sentence that would allow me to retake my life which I would return to carry it in a perfect manner with my children.

I want to be with my children, with my wife, my parents, my students and all these people that I always been there for them.  Thank you, Your Honor.

THE COURT:  Mr. Nunez-Gutierrez, is there anything you care to say to me before I impose sentence?

DEFENDANT NUNEZ-GUTIERREZ:  I want to apologize to Your Honor, to this country, and above all, to all the people because I found myself involved in this crime. But never in my life had I ever been involved in any type of crime.

THE COURT:  Yes, you were, just before this smuggling venture, you were involved in the other one, right, the one that was successful?

DEFENDANT NUNEZ-GUTIERREZ:  Yes.

MR. BATISTA:  Your Honor, I think what he is trying to say is that before becoming involved aboard the Gatun, he was never involved in any crime or criminal activity, and I believe -- and I believe if the Court were to ask the agent from his interviewing of all the individuals, they will attest that they had never been involved in any type of criminal activity with my client before his involvement aboard the Gatun.  I believe that is what he is trying to explain to the Court.

THE COURT:  So what are you saying, that before this involvement in this conspiracy he never did anything

illegal?

MR. BATISTA:  Yes, Your Honor.

THE COURT:  Okay.

DEFENDANT NUNEZ-GUTIERREZ:  And I only request that you consider the sentence and I have hope to see my family again.  Thank you.

THE COURT:  Thank you.

Mr. Murray, does the Government care to be heard anymore?

MR. MURRAY:  No, Your Honor.

THE COURT:  All right, thank you very much.

All right.  In preparation for this sentencing, I seriously considered an upward variance, no matter where I fixed the guideline range.  You know, I've been here for over 10 years, and over that 10-year span, I've sent several people to Federal prison for life for drug offenses, lower-level drug dealers who dealt, of course, in crack cocaine, and who, of course, had certain enhancements, but when you looked at the enhancements, the amount of cocaine involved in that person's career didn't even begin to approximate the substantial quantity of cocaine involved in this case; 19 and one half tons, one of the biggest seizures in the history of the sea.  I mean, under the guidelines, what is it; 150 kilograms or more is the upper limit?

MR. MURRAY:  Yes, Your Honor.

THE COURT:  You know, I mean, this just was an incredible smuggling venture.  And you know, I'm looking at the 3553(a)1 through 7 factors.  The nature and circumstances of the offense.  Again, just the mere fact of the 19 and a half tons of cocaine is enough just to shock your conscience, at least my conscience, and I think any person in this community would be shocked at the tremendous quantity of cocaine involved in this venture.

And I think we can all agree, at least I would think that reasonable people would agree, that illegal drugs, especially cocaine and its by-product crack cocaine are undermining the very fabric of this country. It's undermining the cultural fabric of this country, the social fabric, the moral fabric, not to say the economic fabric.

And the suggestion has been made there, well, Judge, there's been no showing of any violence here. Well, I've been on the Bench now, as a State Judge, as a Federal Judge for a number of years, and I have dealt with many, many cases where the by-product of illegal drug use has been extremely violent crimes, and that's the by-product of the use of drugs.

The history and characteristics of the

Defendants.  All right, I'll accept the fact that they're well liked in their community.  Although I would note that their own country, right now, the very fabric of that society is at stake, you know, based on the news accounts I've read where the drug traffickers are attempting to undermine the very sovereignty of the Méxican Government by assassinating high-level officials.

But in any event, I'll accept that in their community, they're well liked, they're well loved, all right.

And then we come to 3553(a)2 (a), (b) and (c).  The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the Defendant.

Those factors alone would justify, in my mind, an upward variance, and I want to make clear here, I'm not talking about an upward departure, I've already fixed the guidelines.  I'm talking about an upward variance.  This is, again, a serious offense; 19 and a half tons of cocaine.  And especially important as to afford adequate deterrence to criminal conduct.  How long have we been engaged in Operation Panama Express, Mr. Murray?

MR. MURRAY:  Since 1999, approximately.

THE COURT:  How many people have we sent away?

MR. MURRAY:  Over 1,250, Your Honor.

THE COURT:  Most of it have been low-level people, you know.  Maybe it's about time we sent a message to those who would be on the same level as these gentlemen and even higher that if you attempt to smuggle illicit substances into this country, you will pay a high price with a loss of your liberty for a substantial period of time.  So as I said, I thought very seriously about an upward variance of this case.

As it is now, I think these gentlemen face at the high end of the advisory guidelines a sentence of 327 months which is about 28 years.  In my mind, that is a reasonable sentence.  Anything less would be unreasonable in my mind, and as I've just stated, I think reasonable people would agree that a substantially higher sentence would be in order, but I'll stay within the guidelines.

If there's nothing further, it is the judgment of the Court that the Defendant Jesus Ernesto Mondragon-Garcia is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 327 months as to Counts 1 and 2, those terms to run concurrently.

Upon release from imprisonment, he shall serve a five-year term of supervised release as to Counts 1 and

2, those terms to run concurrently.  While on supervised release, he shall comply with the standard conditions adopted by the Court in the Middle District of Florida.  And additionally, he shall comply with the following special conditions:

If he is deported, he shall not reenter the United States without the express permission of the appropriate Governmental authority.

Having been convicted of a qualifying felony, he shall cooperate in the collection of DNA as directed by his Probation Officer.  The mandatory drug testing requirements of the Violent Crime Control Act are imposed.  I'll direct that he submit to random drug testing not to exceed 104 tests per year.

Based on his financial status, I'll waive imposition of a fine.  I'll direct, however, that he pay the United States a special assessment of $200, which shall be due immediately.

After considering the advisory sentencing guidelines and all the factors identified in Title 18 of the United States Code, Sections 3553(a)1 through 7, I find that the sentence I've imposed is sufficient but not greater than necessary to comply with the statutory purposes of sentencing.

All right.  Ms. George, do you renew all your

previous objections?

MS. GEORGE:  I do, Your Honor.

THE COURT:  Do you have any additional objections you wish to make at this time.

MS. GEORGE:  I do not, Your Honor.

THE COURT:  All right.  Mr. Murray, any objections from the Government?

MR. MURRAY:  No, Your Honor.

THE COURT:  I'll remand him to the custody of the United States Marshal Service to await designation by the Bureau of Prisons.

I now advise you, sir, that you have 10 days within which to appeal my judgment and sentence.  If you fail to appeal within that period of time, that will be a waiver of your right to appeal.

I'll also advise you that you are entitled to the assistance of an attorney in taking an appeal, and if you're unable to afford one, one will be provided for you at no charge.

And finally, if you're unable to afford the Clerk's filing fee, I'll direct the Clerk of the Court to accept your notice of appeal without prepayment of that fee.

Have you been retained, Ms. George, to prosecute an appeal on his behalf?

MS. GEORGE:  I have, Your Honor.

THE COURT:  All right.  With regard to the Defendant Jose Alonso Nunez-Gutierrez, it's the judgment of the Court that he is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 327 months as to Counts 1 and 2, both of those terms to run concurrently.

Upon release from imprisonment, he shall likewise serve a five-year term of supervised release as to Counts 1 and 2, those terms to run concurrently. While on supervised release, he shall comply with the standard conditions adopted by the Court in the Middle District of Florida.  And additionally, he shall comply with the following special conditions:

If he is deported, he shall not reenter the United States without the express permission of the appropriate Governmental authority.  Having been convicted of a qualifying felony, he shall cooperate in the collection of DNA as directed by his Probation Officer.  The mandatory drug testing requirements of the Violent Crime Control Act are imposed.  I will direct that he submit to random drug testing not to exceed 104 tests per year.

Based on his financial status, I will also waive imposition of a fine.  I will direct, however, that

he pay the United States a special assessment of $100 -- $200 which shall be due immediately.

After considering the advisory sentencing guidelines and all the factors identified in Title 18 of the United States Code, Sections 3553(a)1 through 7, I find that the sentence I've imposed is sufficient, but not greater than necessary to comply with the statutory purposes of sentencing.

Mr. Batista, do you renew all your previous objections?

MR. BATISTA:  Yes, I do, Your Honor.

THE COURT:  Do you have any additional objections to make at this time?

MR. BATISTA:  No, Your Honor.

THE COURT:  Mr. Murray, any objections from the Government?

MR. MURRAY:  No, Your Honor.

THE COURT:  I'll remand him to the custody of the United States Marshal Service to await designation by the Bureau of Prisons.

Mr. Nunez-Gutierrez, I also advise you that you have 10 days from today's date from which to appeal my judgment and sentence, and if you fail to appeal within that period of time, that will be a waiver of your right to appeal.

I'll also advise you that you are entitled to the assistance of an attorney in prosecuting an appeal, and if you're unable to afford one, one will be provided for you at no charge.

And finally, if you're unable to afford the Clerk's filing fee, I'll direct the Clerk of the Court to accept your notice of appeal without prepayment of that fee.

Have you been retained to represent him on appeal?

MR. BATISTA:  Yes, Your Honor.

THE COURT:  All right, thank you.

Thank you everybody.

MR. BATISTA:  Thank you.

MS. GEORGE:  Thank you, Your Honor.

MR. MURRAY:  Thank you, Your Honor.

(Thereupon, the proceedings concluded.)

*****

                              INDEX

                                                          Page
EXAMINATION:

JEB FEREBEE
      BY MR. MURRAY                                         11
      BY MS. GEORGE                                         19
      BY MR. BATISTA                                        50
      BY MR. MURRAY                                         57


                        *  *  *  *  *

                        EXHIBITS


      NONE

                        *  *  *  *  *

CERTIFICATE


STATE OF FLORIDA          )
                         SS
COUNTY OF HILLSBOROUGH    )


I, CLAUDIA SPANGLER-FRY, Official Court Reporter for the United States District Court, Middle District, Tampa, Division,

DO HEREBY CERTIFY, that I was authorized to and did, through use of Computer Aided Transcription, report in shorthand the proceedings and evidence in the above-styled cause, as stated in the caption hereto, and that the foregoing pages numbered 1 to 90, inclusive, constitute a true and correct transcription of my shorthand report of said proceedings and evidence.

IN WITNESS WHEREOF, I have hereunto set my hand in the City of Tampa, County of Hillsborough, State of Florida, this 8th day of September, 2008.


CLAUDIA SPANGLER-FRY, Official Court Reporter



BY: s/s CLAUDIA SPANGLER-FRY
`